Filed 6/25/15  In re K.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

|  |  |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| AMADOR COUNTY HEALTH AND HUMAN SERVICES AGENCY, | C077950 |
| Plaintiff and Respondent, | (Super. Ct. No. 12DP0422) |
| v. | |
| S.W. et al., | |
| Defendants and Appellants. | |

Mother, Stacey W., and father, Steven S., appeal the juvenile court's orders terminating their parental rights with respect to the minor, K.S.[1]  They contend the

---

[1]     The minor's sibling, Lindsay S. is not a party to this appeal.

juvenile court erred in finding: (1) the minor adoptable;[2] and (2) the parent-child relationship exception to termination of parental rights did not apply to either parent. We conclude substantial evidence supports the court's finding of adoptability and the inapplicability of the parent-child relationship exception to termination of parental rights, and affirm the juvenile court orders.

FACTUAL AND PROCEDURAL BACKGROUND

*2010 Nevada Dependency Proceedings*

In 2010, the family was subject to a dependency case resulting from mother physically abusing the minor. The dependency court in Washoe County, Nevada, ordered the minor and his sister detained. Mother had an alcohol problem and became violent when she drank too much. She was arrested and convicted of child endangerment. The Washoe County Child Protective Services placed the children in foster care and the court ordered reunification services. Mother and father separated in December 2010, when father was arrested for domestic violence. Mother was the victim and the children witnessed the violence.

The minor was diagnosed with Oppositional Defiant Disorder (ODD), Post-Traumatic Stress Disorder (PTSD), Attention-Deficit Hyperactivity Disorder (ADHD), and was prescribed medication for these conditions. Mother had overmedicated the minor and he could barely speak coherently. The minor had an IEP plan (Individualized Education Program). Mother had home schooled the minor until dependency proceedings. Once the minor started attending school, he excelled and his speech improved tremendously.

---

[2]     Father makes this argument in his opening brief and mother joined in the argument.

2

Father did not reunify with the children. He had not had the children for overnight visits since December 2010, and the children were afraid of him. The children's therapist stated the children suffered PTSD as a result of the violence in the household. The therapist was unwilling to conduct joint counseling with the children and father due to their fear of him.

Mother completed reunification services, and the court returned the children to mother in December 2010 with family maintenance services. In March 2012, the court terminated dependency jurisdiction.

### Current Proceedings

In September 2012, deputies from the Amador County Sheriff's Office responded to the family's home due to a report of domestic violence between mother and the maternal grandfather. The mother was arrested for an outstanding warrant from Nevada for a probation violation for leaving the state without the permission or knowledge of the probation department. Specifically, mother had traveled with her boyfriend, Mark, and the children to Arizona. Due to mother's arrest and father's unknown whereabouts, the children were placed in protective custody. The children wanted to be returned to mother, but were afraid of father and did not want to be in his custody.

The Amador County Department of Social Services (the Department) filed a petition alleging the minor came within the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (g).[3] The juvenile court found the allegations true and sustained the petition. The Department placed the children in a foster home together.

On March 13, 2013, prior to disposition, the Department filed a subsequent petition under sections 342 and 300, subdivision (b). The petition alleged the children

---

[3] Undesignated statutory references are to the Welfare and Institutions Code.

3

did not feel safe with their mother when she drinks and abuses her psychotropic medications, which she had continued to do since March 2012. During a home visit, mother told the social worker she and Mark planned to get married in May. Mother acknowledged she had had a drink a few days earlier. There were two reports of suspected domestic violence in September 2012 between mother and maternal grandfather; the children were present during at least one of the incidents. The children were also afraid of Mark and of returning to mother's care while she was in a relationship with Mark. They had witnessed two incidents of domestic violence between mother and Mark. Mother left Nevada with Mark and her children knowing there was a restraining order in effect against Mark. The minor reported he did not want to return to mother's care and he was very angry with her.

At the April 2, 2013, combined dispositional and jurisdictional hearing, the juvenile court found the allegations of the subsequent petition true and continued the children in their current placement. The juvenile court granted mother supervised visitation once a week and supervised telephone visits three times per week. Father did not appear at the hearing, but the court granted him supervised telephone visits, supervised written contact, and supervised visits if he traveled to Amador County. The juvenile court ordered reunification services for both parents.

After 18 months of services, the social worker concluded it would be detrimental to the children to be returned to either mother's or father's care. Neither mother nor father appeared at the 18-month review hearing. The juvenile court terminated reunification services and set the matter for a permanency planning hearing. (§ 366.26.)

*The Minor*

On September 12, 2012, the Department placed the children in a confidential foster home. The children were doing well in their placement and appeared to feel safe and cared for. They were doing well in school, and enjoyed their classes and classmates.

4

The children were also in therapy with Dr. Halloran. The children appeared to have a very close relationship with mother.

In March 2013, the minor had adapted well to the foster home and wanted "to stay here forever." He was doing very well in school, got along well with his peers, had great social skills, great manners, and a big heart. He had been looking forward to mother's release and going back to live with her until he found out she was back together with Mark, which made him uncomfortable. The minor wanted to feel secure that mother would not drink. He had "many issues he would like to work out," and he also wanted to attend family therapy before returning home with mother. The minor did not want to return to mother's care until she stopped drinking and Mark was out of her life. When he spoke of the past, he showed signs of anger, PTSD, and anxiety disorder.

At the September 26, 2014, six-month review, the minor was healthy and doing very well in school. He was brought up a level in special education because he was performing so much better after his medications were adjusted. Dr. Halloran diagnosed the minor with major depressive disorder and PTSD. The minor continued to see his therapist weekly and was doing well working through past issues with his mother.

In August 2013, the children reported they were afraid "mother is just putting on an act in front of staff at the Department during visits as well as in front of the therapists working with them, appearing friendly and caring of the children. The children stated they are concerned that their mother will turn mean again, and go back to her mean ways once CPS is no longer involved with the family." "The family tried family therapy in April 2013 but it was not successful due to the hurt, anger, and distrust of both children who have handled their trauma differently." In October 2013, the children continued to express their worries that mother was putting on an act, and would return to drinking and abusive behavior when the Department is no longer involved, as that is what occurred the last time they were returned to their mother and the Department case was closed. The

children did not trust mother would be able to provide "stable housing and food for them as their history has proven to them that she cannot."

By October 2013, the minor was becoming empowered in his individual therapy sessions to address issues with mother during their con-joint therapy sessions. The children had concerns about their mother's alcohol abuse and abuse of psychotropic medications. They also had "significant trust issues with their mother which are being addressed in con-joint therapy and will continue to be addressed in family therapy." The minor had some family therapy sessions with mother and was able to tell her how angry and upset he was with her. The minor wanted things to work out for his family, where he, mother, and his sister live together. He was resistant to having Mark in their lives based on the past bad times when Mark and mother "would drink and fight with each other."

In February 2014, the social worker reported the minor continued to be healthy and developmentally on track. He also continued to do well in school. The children continued to go to individual therapy, con-joint sessions with mother, and family therapy with Mark. The minor was doing well in therapy, beginning to express his feelings rather than denying them and demonstrating a great deal of insight into mother's behaviors and his reactions to those behaviors.

Despite how well he was doing, mother's behaviors triggered the minor's anxiety and PTSD symptoms. During visits, mother engaged in discussions about the foster parents, the social worker, and Mark, which left the children feeling threatened and emotionally vulnerable. Mother also ignored the minor if he did not behave in a manner she wanted or expected him to. If the children did not interact with mother, she ignored them and refused to hug or kiss them. During one monitored visit, mother blamed the foster parents for her lack of money. After this visit, the minor was so upset he cried and refused to eat dinner. The minor requested a social worker supervise visits from that

6

point forward. The children were much happier and felt safer during visits when they were supervised by the Department. The children continued to tell the social worker mother had not changed, and she was "faking it." She was nice when the visits were supervised and became mean when the visits were only monitored. The minor reported he did not feel safe in Mark's presence. The children loved mother, but did not want to return to her home. They did not feel safe with her. The minor told both the social worker and his foster parents he would rather live with them or with father but not with mother, especially since she and Mark would be married soon. The minor also stated if he was not returned home, he wanted to stay with the foster parents, but not be adopted. The CASA report[4] indicated that since being placed in the foster home, the minor had "improved both in mental and physical health. He looks forward to the future, has improved tremendously at school and feels stable and loved. It appears that contact with his mother causes him strain and stress. He does not want to speak about her, and especially her boyfriend who [the minor] says she is going to marry."

In May 2014, the minor continued to be healthy and developmentally on track. He enjoyed school and was getting good grades. His mental health and emotional status were stable. His foster parents reported that since his placement, he had become more open and social, and his negative behaviors had decreased. The minor "confidently state[d] he wishes to remain in his current placement and be adopted. [The minor] believes that his foster parents love and care about him. They have provided him with stability, routine and structure . . . . [The minor] stated 'My mom chose Mark over me and my sister.' He does not believe his mother's new husband is a 'good guy' and that his mother 'only cares about Mark and money.' "

---

**4**      Court Appointed Special Advocates for Children.
(http://www.casaforchildren.org/site/c.mtJSJ7MPIsE/b.5301295/k.BE9A/Home.htm)

7

The minor had mixed feelings about his visits with mother. He also had telephone contact with father, and reported that contact was "really good." The minor had a secure and loving relationship, and substantial emotional ties with his potential adoptive family.

By the end of May 2014, the minor no longer needed therapy as he was comfortable sharing his feelings with his foster parents. The children were close to their foster parents and siblings and felt safe and comfortable in the home. When offered the choices of long-term foster care, guardianship or adoption, both children immediately said they wanted to be adopted. When the children chose adoption, the foster parents agreed.

In July 2014 after the social worker recommended terminating parental rights, the minor became sullen. He stated he wanted ongoing contact with mother. He wanted to remain with his foster family, but not be adopted.

One month later, the minor's sister was removed from the home when the foster parents found letters detailing how she would "murder [the minor], animals and 'annoying people.' " The minor "has flourished since [the sister] left the home. He is happier, less stressed and guarded, more affectionate and vocal with his feelings." The minor renewed his request to be adopted, saying, " 'I am going to have a good life. They are a loving, caring family. I love them. I want to stay with them forever.' He added that they are 'funny, awesome, like best friends, treat me good, the best family I ever had even better than my mom.' " As to his sister, the minor indicated he would like to have occasional telephone contact with her, but not visits. He also said he did not want future visits with mother and his sister, explaining, "No way. Not now and not in the future, [sister] gets all the attention and I don't trust them." He was connected to his potential adoptive family and felt they were his family. He felt "secure, loved and trusted; which he has never experienced before."

*Father*

At the outset of the case, father maintained twice-weekly supervised telephone calls with the children. Over the next two months, the children had telephone contact with father once a week for approximately 15 minutes a call. The foster parents tried to initiate more phone calls, but often, father would not answer the phone or did not have minutes on his phone. During one call, father appeared to be under the influence, so the foster parents terminated the call early.

The children had not seen their father since June 2012. Father maintained supervised telephone calls two or three times per week until the end of June 2013. By September 2013, father was living in a homeless shelter. He had maintained two to three telephone calls with the children until the end of June. Between June and September, he did not have contact with the children. He resumed contact with the social worker in September. By October 2013, father had moved from the homeless shelter and was living with a friend. He resumed supervised telephone calls with the children at that time. The children were excited about the calls and said they missed their father very much.

As of February 2014, father had found an apartment in Nevada and obtained a cell phone. Father claimed his telephone visitation had been inconsistent due to a lack of access to a telephone. Nonetheless, even with the cell phone, father's telephone visits continued to be sporadic, as he was working a graveyard shift and was usually asleep when the children called. Otherwise, his telephone visits to the children have been supportive and positive.

*Mother*

When the proceedings commenced, mother was in custody in Nevada on the probation violation. During that time, she maintained her contact with the children. After she was released from custody, mother regularly visited with the children. In

August 2013, the visits increased in frequency to twice a week. Visits went well but the minor's sister demanded "most of mother's attention" leaving the minor to engage with the supervising worker. During visits, the minor was often ignored or excluded while mother and his sister were otherwise engaged. The sister also bullied the minor during visits. Beginning in October 2013, the social worker monitored the visits, as a natural transition from supervised to unsupervised visits. In December 2013, the minor requested the visits again be supervised.

Mother was arrested on February 12, 2014, and charged with spousal battery. She admitted to the arresting officer she had consumed four large shots of vodka. Mother and Mark were living at a motel, and planned to get married in March 2014.

### *Permanency Planning and Section 366.26 Hearing*

In May 2014, in preparation for the section 366.26 hearing, the Department prepared an adoption assessment. The assessment noted the minor was a 12-year-old child who had been in his current foster home since September 2012, for 19 months. His foster parents wanted to adopt him. The adoptions specialist concluded removal from the foster parents would be seriously detrimental to the minor. The prospective adoptive parents were open to the possibility of continuing contact with the appropriate relatives. The adoptions specialist concluded the minor was likely to be adopted if parental rights were terminated. In its May 28, 2014, section 366.26 report, the Department agreed with the adoptions specialist that adoption was the appropriate permanent plan, and recommended the juvenile court order adoption as the permanent plan.

On July 7, 2014, the adoptions specialist reported the minor said he wanted to remain with his foster family but did not want to be adopted at this time. While the minor had previously said he did not want ongoing contact with mother, he now stated he does want contact with mother. The court continued the July 24, 2014, section 366.26 hearing based on the minor's uncertainty regarding his permanent plan. The court also

10

noted mother's contact with the children was negatively impacting the minor. After a visit, mother followed foster mother home and made statements that made foster family feel unsafe. The court expressed its concern regarding mother's actions and the destabilizing impact she was having on the children. Accordingly, the juvenile court reduced mother's and father's visitation to supervised one-hour visits once a month.

In August 2014, following the minor's expression of renewed desire to be adopted, the adoptions specialist interviewed the minor again and found the minor suitable for adoption and it was likely he would be adopted if parental rights were terminated. In its October 16, 2014, addendum report, the Department again agreed with the adoptions specialist that adoption should be the permanent plan for the minor. The minor had been living in his prospective adoptive home for over two years, he was happy with his prospective adoptive family, and looked forward to being adopted by them. Since the minor's sister moved to a new home, the minor felt a weight had been lifted off his shoulders. The prospective adoptive parents had never seen the minor as happy.

At the contested section 366.26 hearing on November 13, 2014, the adoptions specialist testified that after several face-to-face meetings with the minor, her current recommendation was adoption for the minor. "He very adamantly states that he wants to be adopted, gives me numerous reasons why and the family is vested and willing to adopt." The minor had been consistent in this position over the last three months. She had no concerns he would change his mind again. The adoptions specialist explained the meaning of adoption to the minor and that he might not have further contact with father, mother, or his sister if he were adopted. In response, the minor said he wanted to be adopted. The minor told the adoptions specialist he had not initially had much of a relationship with father, but since these proceedings began, it had become a more positive relationship. The minor did not express any concerns about not being able to maintain a relationship with his biological family.

11

The social worker also testified she had met with the minor and was confident his desire to be adopted was one he had thought through and he understood the ramifications of adoption. She agreed the minor loved father and their relationship had improved over the course of the dependency proceedings. However, over the last few months, the minor had made clear he did not want to go to visits with mother. She opined that when the minor first changed his mind about adoption, indicating he did not want to be adopted, that was because his sister had changed her mind and bullied him. She believed the minor had "always wanted to be adopted by this family and has wanted that for quite sometime." With the sister removed from the home, the minor was able to state his own "feelings without reprisal from his sister."

Father testified he had not been in regular contact with the minor over the last six months, and had not "really spoke to him" in the past two months. Prior to that they spoke approximately three times a month. He had last seen the minor two or three years earlier. Father had not spoken to the minor about them living together, but hoped over time when their bond was established like it used to be, they could see other. Father believed adoption was not in the minor's best interests because "I know him, I know he loves me, I know he loves his mom in different ways, but repairing the relationship," and father did not want to lose his connection with his son.

Mother did not testify. She objected to adoption. She recognized, however, the minor was attached to his foster parents and was well cared for there.

The juvenile court considered the fact the minor had previously changed his mind on adoption, but was not persuaded that should be a barrier to adoption. The juvenile court also noted the minor was flourishing with the prospective adoptive parents and was doing better in the home since the sister had moved. The juvenile court viewed the minor's desire to continue to have contact with father as an expression of preference, not an objection to the termination of parental rights. The juvenile court

12

found it likely, by clear and convincing evidence, the minor would be adopted. The juvenile court terminated parental rights and declared adoption as the permanent plan for the minor.

DISCUSSION

I

*Adoptability*

The parents contend there was insufficient evidence to support the juvenile court's finding the minor was adoptable because the minor's vacillating position on adoption undermined the adoptability finding. We conclude there is substantial evidence of the minor's adoptability.

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1).) We review the juvenile court's order to " ' "determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]" We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]' [Citation.]" (*In re I.I.* (2008) 168 Cal.App.4th 857, 869 (*In re I.I.*).)

The determination whether a child is adoptable "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed parent 'waiting in the

13

wings.' [Citations.]" (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) However, the fact a prospective adoptive family is willing to adopt the minor is evidence the minor is likely to be adopted by that family or some other family in a reasonable time. (*In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154 (*Lukas B*.).) Essentially, by expressing an interest in adopting a minor, the prospective adoptive parent provides evidence " 'that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.' " (*In re Asia L*. (2003) 107 Cal.App.4th 498, 510; see also *In re I.I., supra*, 168 Cal.App.4th at pp. 870–871 [noting the identification of a prospective adoptive placement may outweigh a child's negative characteristics for purposes of finding adoptability].)

Here, the 13-year-old minor felt stable and loved in the prospective adoptive home. Although he had mental health issues and special education needs, the prospective adoptive family had been living with the minor for over two years and was willing to adopt him. He was healthy, and developmentally on track. In the care of his prospective adoptive family, his physical and mental health improved. His behavior and performance at school also improved.

When initially asked, the minor immediately and confidently stated he wanted to be adopted by his foster parents because they had provided him with stability, routine, and structure. About one month later, he had second thoughts and expressed his concerns to the adoptions specialist. The social worker believed the minor's sister had bullied the minor into changing his mind. After his sister was removed from the home, the minor reverted to his original position of wanting to be adopted. The social worker believed the minor had always wanted to be adopted by the family and could now express that freely, without fear of reprisals from his sister. The minor also made clear he did not want continued contact with mother or sister because he did not trust them. In the months immediately preceding the section 366.26 hearing, the minor consistently and repeatedly

14

refused to visit with mother. The minor was adamant in stating he wanted to be adopted by the prospective adoptive family and gave numerous reasons why. He felt his potential adoptive family was his family. After the adoptions specialist explained to the minor he might no longer have contact with his biological family if he were adopted, the minor stated he wanted to be adopted. He remained consistent in that position for over three months. After conversations with the minor, both the adoptions specialist and the social worker were confident the minor wanted to be adopted by the prospective adoptive family. On this record, we conclude there is substantial evidence supporting the juvenile court's finding of adoptability.

## II

### *Exceptions to the Termination of Parental Rights*

Mother and father each separately contend the juvenile court erred in not applying the beneficial parental relationship exception to adoption. Mother contends she maintained regular visitation and contact and the minor would benefit from a continued relationship because they had a close relationship, she had custody of the minor for his first 11 years, and although the minor expressed mixed feelings about mother, they had positive interactions. Father contends he maintained regular telephone contact with the minor and through that contact he and the minor developed a close and loving relationship.

### A.

### *Governing Statutory and Legal Framework*

Reviewing for substantial evidence (*In re Derek W.* (1999) 73 Cal.App.4th 823, 825, 827 (*Derek W.*)), we affirm the juvenile court's finding the parents did not establish a statutory exception to the termination of parental rights.

At the section 366.26 hearing, the juvenile court is required to select and implement one of four possible permanent plans for the children. The permanent plan

15

preferred by the Legislature is adoption.  (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411.)

If a child is likely to be adopted, the court is directed to terminate parental rights and

order the child placed for adoption.  (§ 366.26, subd. (c)(1).)  However, section 366.26,

subdivision (c)(1)(B)(i), provides an exception when the parent has "maintained regular

visitation and contact with the child and the child would benefit from continuing the

relationship."  The parents had the burden to show this statutory exception applied.  (*In re

Derek W*., *supra,* 73 Cal.App.4th 823, 826.)  We review the evidence in the light most

favorable to the prevailing party and indulge all legitimate and reasonable inferences to

uphold the court's rulings.  (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576

(*Autumn H*.).)

Termination of parental rights may be detrimental to the minor when:  "The

parents have maintained regular visitation and contact with the child and the child would

benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  It is not enough,

however, to show "some benefit to the child from a continued relationship with the

parent, or some detriment from termination of parental rights."  (*Jasmine D., supra*,

78 Cal.App.4th at p. 1349.)  The benefit to the child must promote "the well-being of the

child to such a degree as to outweigh the well-being the child would gain in a permanent

home with new, adoptive parents.  In other words, the court balances the strength and

quality of the natural parent/child relationship in a tenuous placement against the security

and the sense of belonging a new family would confer.  If severing the natural

parent/child relationship would deprive the child of a substantial, positive emotional

attachment such that the child would be greatly harmed, the preference for adoption is

overcome and the natural parent's rights are not terminated."  (*Autumn H., supra*,

27 Cal.App.4th at p. 575.)  This requires a showing of "more than frequent and loving

contact, an emotional bond with the child, or pleasant visits -- the parent must show that

he or she occupies a parental role in the life of the child.  [Citation.]"  (*In re I.W.* (2009)

16

180 Cal.App.4th 1517, 1527.) Factors courts consider in determining the applicability of the parental relationship exception include: (1) the age of the child; (2) the portion of the child's life spent in the parent's custody; (3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467; *Autumn H., supra,* 27 Cal.App.4th at p. 576.)

## B.

### *Mother*

There is no dispute mother maintained regular visitation and contact with the minor, and there were times when it appeared mother and the minor had a positive relationship. As the minor became more comfortable expressing himself, however, the relationship appeared less positive. "The positive and negative effect of interaction may be shown by such things as, despite regular visitation by the parent, the fact that a child repeatedly expresses that he or she does not want to visit the parent (*Lukas B.*[,*supra*, 79 Cal.App.4th at p. 1155]), and unhappiness and acting out by the child related to parental visits. (*Ibid*.) Indifference to a parent, anger or detachment are also factors indicating the lack of the necessary positive relationship. (*In re Amanda D*. (1997) 55 Cal.App.4th 813, 822.)" (*In re Angel B., supra,* 97 Cal.App.4th at p. 467, fn. 4.)

As early as March 2013, the minor stated he wanted to live with his foster parents forever and did not want to return to mother's care. He consistently made clear he did not want to live with mother's husband, Mark, because he did not feel safe in his presence. As a result, the minor also did not feel safe living with mother.

The minor had mixed feelings about visits with mother. During the visits, the minor was often excluded by mother and the sister. If the minor did not behave as mother wanted or expected, mother ignored him. During visits mother also engaged in discussions that left the minor feeling threatened and emotionally vulnerable. After one

17

visit, the minor was so upset by mother's behavior he requested future visits be supervised. Mother's actions during her contact with the minor had a destabilizing impact on him. In the months leading up to the hearing, each time the minor was being picked up to visit mother, the minor made it very clear he did not want to go to the visit. When the adoptions specialist informed him adoption meant he might not have further contact with mother, he stated he wanted to be adopted.

Nor does the record contain evidence that separation from mother harmed the minor. The minor did not act out when separated from mother or when visits were decreased and required supervision. To the contrary, the minor's physical and mental health improved upon being removed from mother, and his negative behaviors decreased. The minor was very angry with mother and had significant trust issues with her. He repeatedly stated she was putting on an act before therapists, appearing friendly and caring. Family therapy was unsuccessful due to the minor's feeling of hurt and anger, and his distrust of mother. Mother's behavior triggered the minor's anxiety and PTSD symptoms. Coinciding with the removal of the minor's sister from the foster home, the juvenile court decreased the minor's visits with mother, and the minor flourished. The prospective adoptive parents reported the minor had never been happier. We conclude the record provides sufficient evidence to substantiate the juvenile court's finding the parent-child relationship exception does not apply to mother.

## C.

### *Father*

Father's contact with the minor was less consistent than mother's. In the early stages of the proceedings, father often did not answer his phone or have an available operational phone. For a period of time he maintained consistent telephone contact, but from June 2013 to September 2013 he had no contact with the children. In October 2013, he resumed contact with the children, but the contact was sporadic due to his work

18

schedule, and the telephone contact remained supervised. Prior to the termination hearing in November 2014, father had not been in regular contact with the minor for six months, and had not spoken to the minor for two months. We conclude father's sporadic visitation with significant lapses in telephone contact does not satisfy the first prong of the parent-child relationship exception to adoption. (*In re I.R.* (2014) 226 Cal.App.4th 201, 212; *In re C.F.* (2011) 193 Cal.App.4th 549, 554.)

Even if father's visitation was sufficient to satisfy the first prong of the exception, he has not established the minor would benefit from maintaining the relationship to such a degree as to outweigh the minor's interest in permanency. Father had not had overnight visits with the minor since 2010. At that point, the minor was afraid of father and suffered PTSD as a result of the violence committed by father in the household. Based on the minor's level of fear, the therapist refused to conduct joint counseling with the children and father. The minor had not seen his father since June 2012. The minor remained afraid of father when these proceedings commenced. As the proceedings continued, the relationship between the minor and father improved. The minor missed his father and was excited about phone calls. Father's contact with the minor was positive and supportive. The minor reported the telephone calls with father were "really good."

Despite this largely positive recent contact with father, there is no evidence father occupied a parental role with the minor or the minor sought guidance from him. The minor reported he and father had not had much of a relationship, but since these proceedings it had become more positive. There was no evidence of detriment to the minor when father was out of contact during the summer of 2013 or in the months preceding the termination hearing. In fact, during this period, the minor continued to thrive. Although the minor stated he wanted to stay in contact with father, he did not express any concern about not being able to maintain the relationship with

19

father if he were adopted.  Based on this record, we conclude sufficient evidence supports the juvenile court's finding the parent-child relationship exception does not apply to father.

DISPOSITION

The orders of the juvenile court are affirmed.

      HOCH    , J.

We concur:

     BLEASE   , Acting P. J.

     BUTZ    , J.